11-3486-cv
*Looney v. Black et al.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————

August Term, 2012

(Argued: September 27, 2012               Decided: December 21, 2012)

Docket No. 11-3486

—————————

PATRICK LOONEY,

*Plaintiff-Appellee*,

– v. –

WILLIAM BLACK, RIVA R. CLARK, AND JOSEPH LABELLA,

*Defendants-Appellants*,

TOWN OF MARLBOROUGH,

*Defendant.*

—————————

Before:    JACOBS, *Chief Judge*, STRAUB AND DRONEY, *Circuit Judges.*

—————————

An appeal from an order of the United States District Court for the District of Connecticut (Vanessa L. Bryant, *Judge*), denying Defendants-Appellants Black, Clark, and LaBella's motion to dismiss on the ground that they were each entitled to qualified immunity. We hold that the District Court erred in determining that defendant Black was not entitled to qualified immunity as to plaintiff's procedural due process claim, as plaintiff does not adequately allege that he had a constitutionally protected property right in retaining full-time, rather than part-time, employment. We hold also that the District Court erred in determining that defendants Black, Clark, and LaBella were not entitled to qualified immunity as to plaintiff's claim under the First Amendment, as plaintiff does not adequately allege he engaged in protected speech made as a private citizen.

Accordingly, the order of the District Court is **REVERSED**, and the case is **REMANDED** with direction to enter judgment for the Defendants-Appellants.

Judge DRONEY dissents in a separate opinion.

JACQUES J. PARENTEAU (Justin E. Theriault, *on the brief*), Madsen, Prestley & Parenteau, LLC, New London, CT, *for Plaintiff-Appellee*.

MICHAEL J. ROSE (Robin B. Kallor and Johanna G. Zelman, *on the brief*), Rose Kallor LLP, Hartford, CT, Andrew L. Houlding, Rome McGuigan, P.C., Hartford, CT, *for Defendants-Appellants*.

STRAUB, *Circuit Judge*:

Plaintiff Patrick Looney served as the Building Official for the Town of Marlborough, Connecticut from 1994 until 2010. He now sues Marlborough as well as three members of Marlborough's Board of Selectmen, Defendants-Appellants William Black, Riva Clark, and Joseph LaBella, under 42 U.S.C. § 1983, alleging that he was deprived of his procedural due process and free speech rights when his position was reduced from full to part time after he made certain statements regarding the use of wood-burning stoves, as well as when he subsequently was not reappointed as the town's Building Official.

For the reasons that follow, we hold that the District Court erred in determining that Defendant-Appellant Black was not entitled to qualified immunity as to Looney's Fourteenth Amendment procedural due process claim, as Looney has not adequately alleged that he had a constitutionally protected property right in full-time employment. We hold also that the District Court erred in determining that Defendants-Appellants Black, Clark, and LaBella were not entitled to qualified immunity as to Looney's First Amendment claim, as Looney does not adequately allege that he spoke in his capacity as a private citizen. Accordingly, we **REVERSE** the order of the District Court, and **REMAND** the case with the direction that the District Court enter judgment for Defendants-Appellants.

2

**BACKGROUND**

The following facts are drawn from the allegations in Looney's Second Amended Complaint ("SAC") and are assumed true for purposes of this appeal.

The position of Building Official is established in the town of Marlborough, Connecticut's Town Charter ("Charter"). The Charter notes that the powers and duties of the position are prescribed by ordinance and the Connecticut General Statutes. The Charter also gives Marlborough's Board of Selectmen the power to appoint all officers set forth therein, including the Building Official.

Connecticut law provides that a Building Official is appointed to a "term of four years and until his successor qualifies . . . ." Conn. Gen. Stat. § 29-260(a). A Building Official may be "dismissed" under the procedures set forth in Connecticut General Statutes § 29-260(b) and (c) if and when he "fails to perform the duties of his office." *Id.* § 29-260(b), (c). The Charter notes that approval of the entire Board of Selectmen is needed to discharge or remove any appointed official or employee of the town, including the Building Official.

Looney was appointed as Marlborough's Building Official on August 15, 1994. He learned of the position from a public notice that quoted a salary and stated that the position included a pension and benefits package, both of which are available only to full-time employees. Prior to his accepting the job, Marlborough's then-First Selectman Howard Dean told Looney that he would be given full-time, salaried employment at $33,000 per year, along with a full benefits package.

Subsequently, Looney was reappointed as Marlborough's Building Official four times, in November 1995, November 1999, February 2004, and April 2006. At this last reappointment,

Marlborough's Board of Selectmen "decided to 'continue [his] appointment per C.G.S. Sec. 29-260(a) for an additional four years.'" (JA-90, ¶ 17.) No other conditions or terms of this last reappointment were noted by the Board of Selectmen at that time.

Throughout these appointments, and until February 2, 2010, Looney was always a "full[-]time employee entitled to all benefits provided to full-time employees according to Section 1.1C of the Town's Personnel Rules and Regulations. These benefits included, but were not limited to, group health and dental insurance, group life insurance, long term disability insurance, contributions to retirement, bereavement leave, personal days, leave of absence with pay for jury duty, reimbursement/ accumulated sick leave, holiday pay, and vacation pay." (JA-90-91, ¶ 19.) A collective bargaining agreement ("CBA") entered into between the town and Local 1303-433 of Council 4 AFSCME, AFL-CIO ("Union") on July 1, 2007 recognized the position of Building Official as full time.

In October 2009, Looney filed a grievance relating to a purported infringement of his First Amendment rights by his supervisor Peter Hughes, who served as Marlborough's Planning & Development Director. Hughes allegedly attempted "to limit [Looney's] communication of information to a Town resident regarding wood burning boiler/stove and smoke discharge as public health concerns." (JA-91-92, ¶ 23.)

After Looney filed his grievance against Hughes, matters escalated. Hughes again requested that Looney not "engage in discussions of substantive matters outside his job duties concerning other Town agenc[ies] or jurisdiction[s]." (JA-92, ¶ 24.) Looney continued to protest Hughes's attempts to limit his communication with the public and ultimately retained counsel. His counsel sent Black a letter on December 23, 2009 advising him that Hughes's

4

restriction was an "illegal prior restraint on speech in violation of the First Amendment." (JA-92, ¶¶ 25, 26.) Marlborough announced a week later that it would not remove the restriction Hughes had placed on Looney's speech, and threatened to discipline or discharge Looney. On January 4, 2010, Marlborough's counsel informed the Union that certain of its members would be laid off or have their hours reduced, and that the Building Official position would be reduced to 20 hours a week.

Looney then received a letter from Black on January 28, 2010, confirming the reduction in his hours, and stating that he would be paid "$33 per hour with no additional compensation for loss of benefits." (JA-93, ¶ 29.) On April 5, 2010, Looney notified Marlborough that he intended to file suit against the town for the events that had transpired. He then commenced this litigation on June 14, 2010, asserting claims pursuant to 42 U.S.C. § 1983 based on violations of the First Amendment and the Fourteenth Amendment procedural due process guarantee.

After the lawsuit had commenced, Black announced that he planned to post a notice seeking to fill the Building Official position. LaBella and Clark, as Selectmen, were included in the search committee that interviewed candidates for the position. Looney applied to be reappointed during the application period, and during his interview LaBella noted "that he had brought a lawsuit against" Marlborough. (JA-94, ¶ 39.) Clark also stated during the interview that she had "serious issues recommending someone who is suing the Town." (JA-94, ¶ 40.) Black, Clark, and LaBella all voted for a candidate other than Looney to fill the position. Looney was not reappointed.

On September 30, 2010, Black, Clark, and Labella moved to dismiss Looney's complaint on the grounds that, *inter alia*, all three individual defendants were entitled to qualified immunity as to the applicable claims.[1]   Looney then sought leave to file the SAC.   The District Court granted Looney's motion to file the SAC, and denied defendants' motion to dismiss in its entirety.

In rejecting the argument made by Black that he was entitled to qualified immunity as to Looney's Fourteenth Amendment due process claim, the District Court held that Looney had adequately alleged a valid property interest in full-time employment.   *Looney v. Town of Marlborough*, No. 3:10-cv-1068, 2011 WL 3290202, at *8 (D. Conn. July 30, 2011).   It based this determination on its understanding that while Looney's alleged right to "full-time employment with pension and benefits was not memorialized in a written contract," there was a sufficiently "consistent course of conduct over a period of more than fifteen years," and Looney had "relied upon those benefits to secure medical coverage for himself and his disabled spouse." *Id*.   Thus, the District Court determined that Looney had a constitutionally protected property right under the Fourteenth Amendment.   *Id.*

From this determination, the District Court further concluded that "the law was defined with reasonable clarity and that, based upon the allegations of the [SAC], Black's conduct in reducing Looney's hours was not objectively reasonable."   *Id*. at *9.   Accordingly, it denied the motion to dismiss to the extent that Black argued he was entitled to qualified immunity as to Looney's procedural due process claims.

---

[1] Black is the only individual defendant named in Looney's Fourteenth Amendment procedural due process claim. Black, Clark, and LaBella are all named in the First Amendment claim.   The Town of Marlborough is named only in two separate claims that are not at issue on appeal.   It did not move to dismiss the claims against it.

The District Court then considered Black, Clark, and LaBella's arguments that they were entitled to qualified immunity as to Looney's First Amendment claim. The court denied the motion to dismiss on this ground as well, holding that defendants "appear[ed] to concede that Looney spoke as a citizen instead of pursuant to his official duties," and that Looney's allegations regarding the speech at issue adequately established that it touched on a matter of public concern. *Id*. at *10.

Based on this determination, the District Court held that the SAC adequately alleged both a violation of Looney's clearly established First Amendment rights, and that Black, Clark, and LaBella had committed acts of retaliation against Looney for his speech, such that they did not act in an objectively reasonable manner. *Id.* at *14. Accordingly, the District Court held that the individual defendants were not entitled to qualified immunity at this stage of the litigation as to Looney's First Amendment claims, and their motion to dismiss was denied on this ground as well.

This timely appeal followed.

**DISCUSSION**

Qualified immunity provides government officials "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Government officials who are "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

7

"[T]he 'driving force' behind creation of the qualified immunity doctrine [is] a desire to ensure that '"insubstantial claims" against government officials [will] be resolved prior to discovery.'" *Pearson*, 555 U.S. at 231 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)); *see also Saucier v. Katz*, 533 U.S. 194, 200 (2001) ("A ruling" on qualified immunity "should be made early in the proceedings so that the cost and expenses of trial are avoided where the defense is dispositive"), *overruled on other grounds by Pearson*, 555 U.S. 223.

We review a denial of qualified immunity de novo. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006); *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005). In reviewing such a denial, "[f]irst, we ask whether there was a constitutional violation. If the answer to this question is yes, we must then determine whether the right was clearly established at the time of the violation." *Clubside*, 468 F.3d at 152 (citing *Saucier*, 533 U.S. at 201). A right is clearly established if the law (1) was "defined with reasonable clarity," (2) has been affirmed by "the Supreme Court or the Second Circuit[,]" and (3) where the conduct at issue would have been understood by a reasonable defendant to be unlawful under the existing law. *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998); *see also Reichle v. Howards*, __ U.S. ___, 132 S. Ct. 2088, 2093 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." (citations, modifications, and internal quotation marks omitted)). Finally, we must decide whether "it was objectively reasonable [for the defendants] to believe that their acts did not violate these clearly established rights." *Young*, 160 F.3d at 903 (internal quotation marks omitted).

On appeal, Defendants-Appellants argue that the District Court erred in denying their motion to dismiss the complaint because (1) Black is entitled to qualified immunity as to Looney's procedural due process claim, and (2) all three individual defendants are entitled to qualified immunity as to Looney's First Amendment claim. We address these arguments in turn.

**I.      Procedural Due Process Claim**

In determining whether Looney's complaint adequately alleges that there was a constitutional procedural due process violation, we inquire first as to whether he adequately alleged a property right protected under the Constitution. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77 (1972). Such property interests cannot be found on the face of the Constitution, but rather "are created[,] and their dimensions are defined by[,] existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits." *Id*. at 577. A "unilateral expectation" is not sufficient to establish a constitutionally protected property right. *Id*. Rather, a plaintiff must have "a legitimate claim of entitlement to" the alleged property interest. *Id.*

Where a valid property right is established, we consider whether a plaintiff was deprived of that right without due process. *Narumanchi v. Bd. of Trs. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988). In making this determination, we inquire into what process was due, and whether the government provided such minimum process. *See Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976) (elaborating how to determine what process is due when a plaintiff has been deprived of a valid property interest).

To determine whether Black is entitled to qualified immunity as to Looney's procedural due process claim, we must determine also whether the constitutionally protected property right was "clearly established."[2] *Reichle*, 132 S. Ct. at 2093. This determination is a particularized inquiry based on the situation facing an individual defendant at the time of her alleged actions. A defendant's alleged conduct must have violated plaintiff's procedural due process rights in a manner that "every reasonable official would have understood . . . violate[d] that right." *Id.* at 2093 (citations, modifications, and internal quotation marks omitted).

The District Court's holding that Black was not entitled to qualified immunity as to Looney's procedural due process claim at this stage in the litigation was grounded in the determination that Looney had a constitutionally protected property right in full-time employment. In so deciding, the court relied on three primary sources identified in Looney's complaint. These were: (1) Connecticut General Statutes § 29-260(a)-(c), which establishes both that the Building Official is appointed for a four-year term, and the procedure for dismissing a Building Official who has failed to perform his duties, *Looney*, 2011 WL 3290202, at *7; (2) Marlborough's Employee Handbook, Section 1.1.C, which identifies "full[-]time employees" as those working thirty hour weeks or more, and indicates that those employees are entitled to pension and healthcare benefits, *id.*; and (3) Looney's four reappointments as Building Official over the course of fifteen years, each time beginning his term with pension and benefits as a full-time employee, *id.* at *8.

The District Court, however, did not rely on the CBA in making its determination that Looney had a property interest in full-time employment. Indeed, Looney argued in his

---

[2] A court may exercise its discretion in deciding to first address whether (1) a plaintiff has adequately alleged a constitutional violation, or (2) such a constitutional right was clearly established. *See Pearson*, 555 U.S. at 242.

sur-reply that his property interest was "protected by Connecticut Statute, not the CBA," a statement that the District Court credited. (JA-186, 219.)

The District Court based its holding on *Ezekwo v. New York City Health and Hosps. Corp.*, 940 F.2d 775 (2d Cir. 1991). There, plaintiff Ezekwo was a doctor who had been accepted into a residency program at a hospital run by the defendant. She was notified at the outset of her residency that every resident would "serve as 'Chief Resident' for four months during his or her third year." *Id.* at 777. Shortly before her third year began, despite receiving negative performance reviews, she was again told that she would be serving as Chief Resident later that year. After filing certain allegations of race and gender discrimination against her supervisor, Ezekwo was notified that she would not be able to serve as Chief Resident. *Id.* at 778. We there found that the plaintiff had more than just a "unilateral expectation of becoming Chief Resident" because she had been "consistently . . . informed that she would rotate through the position of Chief Resident and receive a salary differential as a result of that designation." *Id.* at 782-83. Indeed, the practice of rotating residents through the Chief Resident position "was expressly highlighted in HHC's informational documents." *Id.* at 783. Accordingly, we determined that the written documents, the "course of conduct," and "Ezekwo's reasonable reliance thereon" created a contractual right under New York state law that "rose to the level of a significant property interest." *Id.*

The District Court relied on *Ezekwo* to hold that both the Connecticut General Statutes and Marlborough's Employee Handbook, in conjunction with Looney's four consecutive reappointments to the Building Official position, gave rise to a sufficiently "consistent course of conduct" to entitle Looney not only to a property interest in his employment, but to a property

11

interest in full-time employment in particular. *Looney*, 2011 WL 3290202, at *9. The court

emphasized that while Looney's interest was "perhaps . . . of lesser value than Ezekwo's

once-in-a-lifetime opportunity to become a chief resident," full-time employment was still "very

important to him." *Id.* at *8.

Two other cases, *Ciambrello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002) and

*Harhay v. Town of Ellington Board of Education*, 323 F.3d 206 (2d Cir. 2003), were

distinguished by the District Court, which deemed them to be not "directly on point." *Looney*,

2011 WL 3290202, at *7-*8. We, however, find them to be important precedents.

*Ciambrello* concerned a civil service employee who was demoted back to his original

position from a recent promotion because Nassau County, his employer, determined he had been

promoted in violation of his union's collective bargaining agreement. *Ciambrello*, 292 F.3d at

312. We held that the applicable collective bargaining agreement, which expressly prohibited

demotion or disciplinary proceedings absent "incompetence and/or misconduct," gave the

plaintiff a "property interest in his promotion," as he was demoted in direct violation of the

collective bargaining agreement's terms. *Id.* at 316.

*Harhay* similarly involved a property right that we held was established under the terms

of the applicable CBA. *See Harhay*, 323 F.3d at 212. Based on the text of the collective

bargaining agreement at issue in that case, which provided the plaintiff a "contractual right . . . to

be reappointed to any vacant position for which she was qualified," we determined that it was

"clear" that the plaintiff, a tenured school teacher, had a constitutionally protected property right

in being reappointed. *Id.*

12

*Ezekwo*, *Ciambrello*, and *Harhay* therefore all involved a plaintiff who had been promised something explicitly — either verbally, or in the terms of the applicable collective bargaining agreement — about specific conditions during the future term of their employment. Ezekwo was told both in writing and in person that she could expect to be chief resident during her third year of residency. *Ezekwo*, 940 F.2d at 782. Ciambrello was working pursuant to a collective bargaining agreement that stated he would not be demoted without engaging in incompetence or misconduct. *Ciambrello*, 292 F.3d at 319. Harhay was contractually promised that she would be reappointed to an available position. *Harhay*, 323 F.3d at 212.

In this case, however, Looney does not allege that any writing or verbal communication he was a party to indicated that his position as Building Official necessarily was to continue full time, or even that he was guaranteed reappointment to the position. He alleges, instead, simply that it always had been so.

In doing so, he relies on a conglomeration of sources that he argues create a sufficient "course of conduct," including (1) the relevant Connecticut General Statutes sections; (2) a discussion he had in 1994 with then-First Selectman Dean regarding the terms of his initial appointment as Building Official; (3) the 1994 job advertisement for the position of Building Official, which indicated that it came with a "pension/benefits package"; (4) the Marlborough Employee Handbook, which defines a "full[-]time employee" as one who works thirty hours or more per week, and indicates that such employees are entitled to pension and benefits; and (5) the fact that he was reappointed four separate times over a fifteen year span, and that during the entirety of each appointment (until the last) he worked as a full-time employee, receiving pension and benefits.

13

Nothing in any of these documents or interactions, however, indicates that Marlborough or any other party provided a written guarantee or an explicit indication that Looney should expect to be employed full time from appointment to appointment, or throughout the duration of a single appointment. While Looney alleges that the discussion he had and advertisement he saw regarding the position in 1994, before he was first appointed, indicated that he could expect the job to be full time and to come with pension and benefits, those statements were made more than fifteen years ago, and indicated, at best, only the "terms and conditions" of Looney's initial appointment.

Furthermore, Connecticut General Statutes § 29-260 states only that the Building Official is to be *appointed* for four years, and provides a mechanism for *removing* the Building Official from his or her position if and when certain conditions are met. It is silent as to any guarantee or procedural requirement for reducing a Building Official's hours from full to part time.

All of the other documents identified in Looney's complaint — the Employee Handbook, the town's Charter, and the CBA — merely define what was or was not considered "full time" employment, and accordingly whether an employee could expect to receive, *inter alia*, pension and health care benefits. None of these items affirmatively indicated that Looney could expect to continue being a full-time employee. In fact, the SAC alleges only that the Board notified Looney of his final term of reappointment in April 2006 by stating that it had decided to "continue [Plaintiff's] appointment per C.G.S. Sec. 29-260(a), for an additional four years effective August, 2006." (JA-90, ¶ 17; JA-150.) But the Board said, and therefore guaranteed, nothing about the terms of that appointment when it so notified him.

14

The complaint's allegations, without any written or spoken guarantee as to the terms of his employment, leave Looney with nothing more than a "unilateral expectation" that he would continue to be reappointed to his position, and that such reappointment would be full time. Such a unilateral expectation does not qualify as a constitutionally protected property right. *See Roth*, 408 U.S at 577 (stating that an "abstract concern in being rehired" without more is insufficient to create a property interest). Indeed, while none of the documents or interactions on which Looney relies can rightly be said to create an affirmative expectation that he would continue to be a full-time employee, the CBA, which provides in Article 23 that the town may "determine[] that layoffs or reductions in hours are necessary" (JA-168), and provides also a hierarchy by which such layoffs and reductions should take place, affirmatively indicates that he should have been prepared for the possibility that his hours would be reduced.

We do not doubt that Looney's interest in his continued full-time employment was important, or that he has felt the negative effects of being deprived of his pension and health care benefits. Unfortunately, however, Looney's interest in these items does not suffice to guarantee them constitutional protection as property rights to which he has any procedural entitlement.[3] We therefore conclude that Looney has not adequately alleged a constitutionally protected property interest in his full-time employment. Accordingly, the District Court erred in

---

[3] The few other Second Circuit and Supreme Court cases cited by the parties that discuss employees' property rights in the specific terms of their employment do not assist Looney either. *See Roth*, 408 U.S. at 576-78 (holding assistant professor did not have property right in renewed employment where no mention of re-employment existed); *O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005) (finding property right in forcing plaintiff to take sick leave without pay, as it was comparable to a suspension without pay); *Finley v. Giacobbe*, 79 F.3d 1285, 1294-95 (2d Cir. 1996) (stating that at-will probationary employees do not have protectable property rights in their employment); *Narumanchi*, 850 F.2d at 72 (holding plaintiff had a property right in his employment that was violated by two-week suspension without pay, but determining that plaintiff had not utilized already available process for airing his grievance).

determining that Black was not entitled to qualified immunity as to Looney's procedural due process claim.

**II.      First Amendment Claim**

As with Looney's Fourteenth Amendment claim, the individual defendants moved to dismiss Looney's First Amendment claim, and so the allegations must be read in the "light most favorable to [Looney], and [we] construe the complaint liberally."  *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (internal quotation marks omitted).   We are bound to make our determination based only on the contents of the complaint.  *See McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (stating that the court can only consider the "face of the complaint" in deciding whether a defendant is entitled to qualified immunity on a motion to dismiss).

In determining whether a defendant is entitled to qualified immunity as to a plaintiff's First Amendment claims, we must first determine whether the plaintiff's constitutional right to free speech was impinged.   Generally, government employees are entitled to First Amendment protection when they speak as a private "citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009).   A "matter of public concern" is one that relates to a "matter of political, social, or other concern to the community."  *Connick v. Myers*, 461 U.S. 138, 146 (1983).

Public employees speaking "pursuant to their official duties," however, are not afforded protections under the First Amendment.   *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012) (internal quotation marks omitted).   "This is the case even when the subject of an employee's speech is a matter of public concern."  *Id*.   It is also true, however, that "a public employee does not relinquish First Amendment rights to comment on matters of public interest [simply] by

16

virtue of government employment." *Connick*, 461 U.S. at 140. Rather, where the speech at issue "owes its existence to a public employee's professional responsibilities," *Garcetti*, 547 U.S. at 421-22, it can properly be said to have been made pursuant to that party's official duties. *See also Ross*, 693 F.3d at 308 (holding the speech at issue was not protected because it "owed its existence" to plaintiff's "job duties"); *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010) (noting that the speech alleged was "part-and-parcel" of the plaintiff's employment responsibilities (internal quotation marks omitted)).

To defeat an assertion of qualified immunity, an employee's constitutional right to free speech must also be "clearly established" under the law. *Reichle*, 132 S. Ct. at 2093. Further, even where a plaintiff has shown that the defendant's actions violated a clearly established constitutional right, the defendant may still be entitled to qualified immunity if she is alleged to have acted in an objectively reasonable way. *See Amore*, 624 F.3d at 530.

On appeal, defendants argue that they did not, as the District Court determined, "concede" that Looney was not acting in his official capacity, and thus must have been speaking as a private citizen. It is true that defendants failed to cite *Garcetti* or *Weintraub*, or to otherwise make any arguments directly addressing this issue in their motion to dismiss or reply papers below.[4] But it is also true that both the plaintiff and the District Court cited and relied on *Garcetti*. Looney briefed the issue of whether or not he spoke pursuant to his official duties in his opposition to defendants' motion to dismiss. The District court also noted that "public employees are not speaking as citizens for First Amendment purposes when they make

---

[4] Defendants argue on appeal that their general objection below that Looney did not adequately allege he had engaged in protected speech with any particularity encompassed, *inter alia*, the failure to adequately allege that he spoke as a private citizen.

17

statements 'pursuant to their official duties.'" *Looney*, 2011 WL 3290202, at \*10 (quoting *Garcetti*, 547 U.S. at 421).

Thus, the argument is preserved for appeal. *See Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991) (considering an argument that was raised below because the "argument, although different in emphasis from the point pressed on appeal, at least introduced the notion" in the district court). Furthermore, even if the argument had been waived below, we may exercise our discretion and consider it now. *See Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) (stating that because rule that appellate court will not consider argument not raised below "is prudential, not jurisdictional, we have discretion to consider waived arguments" (internal quotation marks omitted)).

We therefore turn to the question of whether Looney's complaint adequately alleges that his speech was made as a private citizen, rather than in the course of his official duties:

> The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule. Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two. Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision.

*Ross*, 693 F.3d at 306 (citation and internal quotation marks omitted). The proper inquiry here is a "practical one." *Garcetti*, 547 U.S. at 424.

Looney's allegations regarding the content and scope of what he said to the town resident, as well as the capacity in which he said it, are vague. The vast majority, if not the totality, of the allegations regarding Looney's allegedly protected speech made to a town resident appear in paragraphs 23 through 25 of his complaint. They are as follows:

> 23. On or about October 8, 2009, Plaintiff filed a grievance claiming harassment relative to his freedom of speech rights based on the attempt by Plaintiff's supervisor, Peter

18

Hughes, Planning and Development Director, to limit the communication of information to a Town resident regarding wood burning boiler/stove and smoke discharge as public health concerns.

24. On October 30, 2009, Peter Hughes responded, "Mr. Looney has been requested to restrict his actions in the office to that of his duties and not to make determinations or engage in discussions of substantive matters outside his job duties concerning other Town agenc[ies] or jurisdiction[s].

25. On November 5, 2009, in a memorandum to First Selectman Black, Plaintiff continued to protest limits placed on his ability to communicate information to the public relative to the outdoor burning boilers issue whereby Plaintiff was voicing his opinion regarding an outside agency enforcing a cease and desist order against Town residents.

(JA-91-92.)

Looney alleges that he "communicat[ed] . . . information to a Town resident regarding wood burning boiler/stove and smoke discharge as public health concerns." (JA-92, ¶ 23.) Similarly, he alleges that he "communicate[d] information to the public relative to the outdoor wood burning boilers issue" by "voicing his opinion regarding an outside agency enforcing a cease and desist order against Town residents." (JA-92, ¶ 25.)

As to the scope of his duties as Building Official, Looney alleges generally that "[a]t all times relevant" to the complaint, he was "employed as the Building Official of the Town of Marlborough," (JA-87, ¶ 1) and as such was responsible for the "administration and enforcement of the State Building Code at the municipal level, including the organization and conduct of the building advisory, inspection and enforcement program" (JA-88, ¶ 7). He further alleges that throughout his employment he kept "uppermost in mind his obligation to enforce the State Building Code to ensure the safety of the townspeople." (JA-91, ¶ 21.)

Beyond this, the complaint does not allege specifics as to what Looney said, or the context in which he said it. The job falls to us to so infer, reading all available allegations in the

19

"light most favorable" to Looney. *Daly*, 243 F.3d at 691 (internal quotation marks omitted).

In the absence of anything more specific, Looney's vague allegations force us to conclude that, as the town employee who oversaw the entire "organization and conduct of the building advisory, inspection and enforcement programs," particularly in light of his self-described "obligation to enforce the State Building Code," the alleged speech set forth in the complaint was closely related to his work as Building Official. (JA-88, ¶ 7.) This understanding is furthered by Looney's dual allegations that (1) it was a part of his job to "ensure the safety of the townspeople" by enforcing the relevant building codes, and (2) the smoke discharge that was causing the issue discussed regarding the wood burning stoves or boilers was a "public health concern[]." (JA-91-92, ¶¶ 21, 23.) The only sensible way to interpret Looney's allegations is that he spoke on these issues *because* he was in an official position that required, or at least allowed, him to do so. It follows that these statements owed their existence to his position as the Building Official. As a consequence, Looney has not adequately alleged that he spoke as a private citizen.

It is true that Looney alleges that his supervisor, in admonishing him for this alleged speech, requested that he refrain from discussing matters "*outside* [Looney's] job duties." (JA-92, ¶ 24 (emphasis added).) It is also alleged that his speech regarded an "*outside* agency enforcing a cease and desist order against Town residents." (JA-92, ¶ 25 (emphasis added).) But "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424-25.

20

Similarly, whether "speech was unprotected does not rest on the fact that [the] speech was made in the workplace as opposed to elsewhere." *Ross*, 693 F.3d at 307.

The face of Looney's complaint alleges nothing more than a vague set of circumstances regarding speech which necessarily "owed its existence" to Looney's role as Building Official. *Id.* at 308. Because the speech at issue is alleged to have been made in the course of Looney's official duties, he has not adequately alleged that such speech is entitled to First Amendment protection.[5]

The District Court therefore erred in holding that Black, Clark, and LaBella were not entitled to qualified immunity as to Looney's First Amendment claim.

## CONCLUSION

For the aforementioned reasons, the order of the District Court denying Black, Riva, and LaBella qualified immunity is **REVERSED**, and the case is **REMANDED** with the direction to enter judgment for the Defendants-Appellants.

---

[5] As Looney has not adequately alleged that the underlying speech is entitled to First Amendment protection, to the extent his First Amendment claims may properly be categorized as claims of retaliation for filing a petition against the Defendants-Appellants, rather than freedom of speech claims, they necessarily fail as well. *See Garcetti*, 547 U.S. at 424.

21

DRONEY, *Circuit Judge*, dissenting:

I respectfully dissent from the majority's resolution of both the due process and First Amendment claims. I cannot conclude that the allegations in Looney's complaint call for qualified immunity and warrant dismissal at this juncture. As to Looney's procedural due process claim, the allegations of the representations and conduct by defendant First Selectman Black and the other Town officials, and the importance of the salary and benefits to Looney, are sufficient to show that he had a property right to full-time employment protected by procedural due process during his four-year statutory term as a Building Official. As to Looney's First Amendment retaliation claim, the allegations in the complaint sufficiently demonstrate that Looney's speech was made as a private citizen and on a matter of public concern. Although discovery may uncover facts to the contrary, it would be premature to conclude otherwise on a motion to dismiss. Accordingly, I would affirm the district court's denial of qualified immunity.

**I.    Procedural Due Process Claim**

Qualified immunity may only be granted if an official has met his burden in demonstrating that no rational jury could conclude "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (internal quotation marks omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (alterations and internal quotation marks omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's position should know

1

about the constitutionality of the conduct. . . . [W]e use an objective standard for judging the actions of state and federal officials." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012) (internal citations and quotation marks omitted). Under this standard, Looney's factual allegations, if accepted as true, would have led the defendants to conclude that reducing Looney's compensation and eliminating his benefits without a hearing violated his right to due process.

Looney has sufficiently alleged in his complaint that he had a protected property interest in his status as a full-time employee during the period of his appointment as Building Official under this Court's prior holdings in *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775 (2d Cir. 1991), *Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002), and *Harhay v. Town of Ellington Board of Education*, 323 F.3d 206 (2d Cir. 2003). Looney alleged that in 1994, when he was appointed to his first statutory term as the Marlborough Building Official, the job advertisement set forth a salary and "pension/benefits package" that were only available to full-time employees of the Town. He also alleged that the then-First Selectman specifically told Looney at the time he accepted the position that the Building Official role was a full-time position with the benefits of other full-time employees, such as pension, healthcare, sick leave, and vacation time. In addition, Looney alleged that the Town's personnel rules and regulations designated him as a "full-time employee entitled to all benefits provided to full-time employees."

Looney alleged that he was reappointed four more times by the Board of Selectmen "as a full time Building Official," and he enjoyed full-time salary and benefits during his entire sixteen years as the Building Official without any indication that he could be reduced from his full-time status. During this period, he received a salary and the same benefits as all other full-time

2

Marlborough employees. The complaint also alleged that in 2007, a collective bargaining agreement entered into by the Town recognized the Building Official position as full-time.[1] It was only in 2010 after Looney spoke out against the actions of Town officials that he was reduced to part-time status and his benefits were terminated. Our prior decisions require due process protection for Looney so that he was at least entitled to a hearing before this reduction in his pay and benefits.

In *Ezekwo*, we considered whether the plaintiff had a property interest in serving as chief ophthalmology resident at the defendant Harlem Hospital Center, which was operated by New York City. The hospital had historically awarded the position to all ophthalmology residents in the last year of their three-year residencies. *Ezekwo*, 940 F.2d at 777-78. However, after the plaintiff began writing letters to the hospital complaining about various working conditions, the hospital decided to change the policy for selecting chief ophthalmology residents to what it claimed was a "merit-based" program and denied the plaintiff the chief resident status. *Id.* at 778-79. In concluding that the plaintiff enjoyed a property interest in the position of chief resident, we focused on two factors. First, we observed a "course of conduct" in which the hospital had consistently offered explicit reassurances to the plaintiff, including verbal statements from supervisors and written informational documents, that she would rotate into the

---

[1] The collective bargaining agreement itself explicitly listed the Building Official as a salaried employee while other listed positions, such as "Administrative Specialist" and "Tax Clerk," were listed as hourly positions. In addition, in their reply brief before the district court, the defendants conceded that Looney could have pursued his grievance regarding the reduction in hours, compensation, and benefits through the procedures established by the collective bargaining agreement. While Looney has not identified the collective bargaining agreement as a source for his property interest, the collective bargaining agreement does further underscore the Town's course of conduct upon which Looney reasonably relied to believe that he had a protected interest in his status as a full-time employee.

chief resident position. *See id.* at 783. Second, we highlighted "the importance to the holder of the right." *Id.* (quoting *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir. 1983)). We found that the plaintiff's interest in serving as chief resident was sufficiently important because her interest "was more than merely financial" and because the position, "due in large part to the very nature of medical training itself, was of significant professional value." *Id.* Accordingly, we found that the plaintiff's "expectation of performing the duties of Chief Resident was reasonable and well founded and rose to the level of a property interest entitled to the protections afforded by the Due Process Clause." *Id.*

In *Ciambriello*, we concluded that a civil service employee enjoyed a protected property interest in his position as a maintenance mechanic and thus was entitled to a hearing when his employer sought to demote him back to his former position as equipment operator. 292 F.3d at 318. As in *Ezekwo*, we focused on the course of conduct toward the plaintiff and concluded that he had a reasonable expectation that he would retain his position – in that case, based on the terms of a collective bargaining agreement. Also, as in *Ezekwo*, we emphasized that the plaintiff's interest in his position, while not a "once-in-a-lifetime opportunity[,] is still significant." 292 F.3d at 318. "After working for the County for nearly five years, [the plaintiff] was promoted to a position that entailed higher pay and greater benefits. [The plaintiff] served in the higher position for well over two years, only to be returned to his original position and salary." *Id.* We therefore had "no trouble concluding that this right was a property right *of sufficient importance* to [the plaintiff] to warrant constitutional protection." *Id.* (emphasis added).

4

In *Harhay*, we concluded that a previously terminated public school teacher possessed a property interest in her position on a "reappointment list" for purposes of determining whether she would be rehired when a vacancy occurred. 323 F.3d at 209, 212. Although we also concluded that the plaintiff had been afforded adequate process through the grievance procedure in her collective bargaining agreement, in determining whether she had a due process right in the possibility of reappointment we emphasized the importance to the plaintiff of the reappointment protection. *See id.* at 212-13. As in *Ezekwo* and *Ciambriello*, we underscored that the plaintiff's position on the reappointment list "can – and should – be characterized as an 'important' interest as opposed to a 'trivial and insubstantial' interest – as it directly affects her right to be employed at all." *Id.* (quoting *Ezekwo*, 940 F.2d at 783).

These decisions emphasize the importance of a course of conduct on which a plaintiff might reasonably rely to establish a property right in the interest in question. However, they do not require, as the majority concludes, that this course of conduct be established through a "written or spoken guarantee as to the terms of [the plaintiff's] employment." As we held in *Ezekwo*, "[a]dditional contractual provisions may be 'implied' into a contract as a result of a course of dealing between the parties. The parties through their conduct and practice can create additional rights and duties." 940 F.2d at 782 (citing *Perry v. Sindermann*, 408 U.S. 593, 602 (1972)). The allegations here of the initial representations to Looney for his first appointment, the advertisement for the position, the Town personnel rules and regulations, and the collective bargaining agreement, as well as Looney's reappointment each time over the course of sixteen years to the position of a "full-time Building Official" without any diminutions of his hours or compensation, are sufficient to allege a course of conduct that implicates a property interest in

5

full-time employment.[2] Even if the majority is correct that the bar for such a property interest is set so high as to require a "written guarantee or explicit indication," I also believe that the allegations in the complaint reach it.[3]

As to the "importance to the holder of the right," *Ezekwo*, 940 F.2d at 783 (internal quotation marks omitted), Looney lost all his health and retirement benefits as well as a significant amount of salary due to the reduction in his hours. If the suspension of a university professor for two weeks without pay implicates a protected property interest, *see Narumanchi v.*

---

[2] The majority points to Article 23 of the collective bargaining agreement, which provides the hierarchy under which the Town would implement "layoffs or reductions in hours." In reviewing a motion to dismiss, our review is "limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002). "Limited quotation does not constitute incorporation by reference." *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (alteration and internal quotation marks omitted). Looney's brief mention of the collective bargaining agreement in his complaint does not constitute incorporation by reference under *Cosmas*, and so it would be inappropriate to rely on the collective bargaining agreement as a basis for resolving a motion to dismiss. However, even if the collective bargaining agreement is incorporated by reference into the complaint, Article 23 provides that layoffs within a job title would take effect in inverse order of seniority, starting with "temporary and seasonal employees," "part-time probationary employees," "full-time probationary employees," and concluding "[b]y seniority of the remaining employees in the job title." Looney was clearly not a temporary or seasonal employee, and because he had served as a Town employee for more than six months, he no longer qualified as a probationary employee under Article 13 of the collective bargaining agreement. Based on a plain reading of Article 23, Looney therefore would seem to have been on notice about a possible reduction in hours under the collective bargaining agreement only if there had previously been layoffs of temporary, seasonal, and probationary employees. However, the extent to which layoffs were occurring around the time Looney's hours were reduced is a factual question that we cannot resolve at this juncture.

[3] Looney alleged that the representations regarding the full-time nature of the Building Official position were made to him the first time he was appointed Building Official. It surely is not required that those assurances needed to have been repeated to Looney explicitly each time he was reappointed to his new statutory term as Building Official, especially when he was at all times treated as a full-time employee. Nevertheless, Looney alleges that each time he was reappointed, it was "as a full-time Building Official with pension and benefits," and he should be given the opportunity to produce evidence to that effect.

6

*Bd. of Trs.*, 850 F.2d 70, 72 (2d Cir. 1988), then surely such a reduction in a Building Official's compensation and the elimination of his benefits require due process protections as well. While there is "no allegation that his [position] was a once-in-a-lifetime opportunity[,] the interest is still significant." *Ciambriello*, 292 F.3d at 318. I therefore conclude that Looney has adequately alleged a clearly established, constitutionally protected interest in his full-time employment, and that Black is therefore not entitled to qualified immunity as to Looney's due process claim at this stage of the litigation.

**II.    First Amendment Claim**

The complaint also contains sufficient allegations that Looney's speech merited the protections of the First Amendment. A public employee is not protected by the First Amendment only if the speech at issue "owed its existence to [the plaintiff's] job duties and was made in furtherance of those duties." *Ross v. Breslin*, 693 F.3d 300, 308 (2d Cir. 2012). Evidence about both the specific content of Looney's speech to the Marlborough residents and Looney's job responsibilities must be presented before it would be appropriate to dismiss his claim on the ground of qualified immunity.

"In order to establish a First Amendment retaliation claim, plaintiffs must prove that: (1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds*, *Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008) (per curiam). To demonstrate that the plaintiff was speaking as a "citizen," the plaintiff must show that he was not speaking "pursuant to [his] official duties." *Ross*, 693 F.3d

at 305 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). If the plaintiff satisfies the three prongs of the *Skehan* test, the

> defendants may nevertheless escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression.

*Skehan*, 465 F.3d at 106. It is clear that Looney suffered an "adverse employment action" in this case, and Looney has adequately alleged in his complaint that his speech motivated the defendants' decision to reduce his compensation and benefits.[4] As a result, the critical questions are whether Looney was speaking on a matter of public concern and whether he was speaking as a private citizen or "pursuant to" his official duties.

As to the first question regarding the content of the statements, Looney's factual allegations sufficiently indicate that he was speaking on a matter of public concern. The Supreme Court has defined "matters of public concern" to include "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

---

[4] Looney names Black, Clark, and LaBella in his complaint on the First Amendment claim. However, his complaint alleges that First Selectman Black reduced Looney's hours without having obtained the approval of the Board of Selectmen, and that Clark and LaBella's involvement was in recommending against reappointing Looney as Building Official in retaliation for Looney's lawsuit against the Town, and then voting against reappointing him. Nonetheless, I believe that Looney has sufficiently alleged unlawful retaliation on the part of Clark and LaBella as well as Black. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) (holding that a plaintiff may "establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms"); *see also Bernheim v. Litt*, 79 F.3d 318, 327 (2d Cir. 1996) (Jacobs, J., concurring) ("It is beyond question that a state agency may not discharge, *refuse to rehire*, fail to promote, or demote a public employee in retaliation for speaking on a matter of public concern." (citing *Rutan v. Republican Party*, 497 U.S. 62, 75 (1990), and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (emphasis added)).

8

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999).

The category of issues of "public concern" discussed in *Connick* has been interpreted broadly to include commenting on policy decisions affecting the public fisc, *see Lewis*, 165 F.3d at 163-64, and raising concerns "about the lawfulness of public officials' actions," *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006). Here, according to his second amended complaint, Looney was communicating with a "Town resident regarding wood burning boiler/stove and smoke discharge as public health concerns" and with members of the public about an "outside agency enforcing a cease and desist order against Town residents."[5] These statements are commentary on public health issues and regulatory enforcement actions, and thus address a matter of public concern.

The allegations of the complaint are also sufficient to show that Looney was speaking as a private citizen, rather than "pursuant to [his] official duties." *Ross*, 693 F.3d at 305 (internal quotation marks omitted). The Supreme Court defines speech made "pursuant to" a public employee's job duties as "speech that owes its existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 421. The inquiry into whether speech is "pursuant to" one's official duties is a "practical one" under which

> [f]ormal job descriptions often bear little resemblance to the duties an employee
> actually is expected to perform, and the listing of a given task in an employee's

---

[5] Although the complaint does not say explicitly whether the outside agency enforcing the cease and desist order relating to smoke discharges from wood-burning stoves was a state or local agency, the complaint is clear that the order was enforced by an agency outside the one in which Looney was employed as Building Official and related to a subject matter that was not part of Looney's responsibilities.

9

written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25.

To determine whether speech was made "pursuant to" one's official job duties, it is necessary to ascertain whether the speech at issue "owed its existence to [the plaintiff's] job duties *and was made in furtherance of those duties*." *Ross*, 693 F.3d at 308 (emphasis added). In *Ross*, we considered whether a school district payroll clerk whose role informally included reporting suspicious payroll requests to her supervisor was entitled to First Amendment protections for writing letters to school board members containing allegations of financial malfeasance. *Id.* at 302-03. We concluded that the clerk was not entitled to First Amendment protection because her letters, despite being sent outside the chain of command, were written "in furtherance of" her informal reporting duties. *Id.* at 308. We have also held that a teacher's complaints to a school board about the inadequate discipline of a disorderly student were "part-and-parcel" of his duties because they dealt with his ability "to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010) (citation and internal quotation marks omitted). Conversely, we concluded that First Amendment protections applied to a police officer's refusal to speak about a colleague's misconduct in part because the speech "did not implicate [the plaintiff's] ability to do his own job properly." *Jackler v. Byrne*, 658 F.3d 225, 240 (2d Cir. 2011).

It may be that Looney's position as Building Official made it possible for him to deliver his comments to the Marlborough residents, and so the comments may have "owed [their]

10

existence to [Looney's] job duties." *Ross*, 693 F.3d at 308. However, Looney's complaint sufficiently alleges that his comments were not made "in furtherance of" his job duties – either formal or informal. After making the comments to a Marlborough resident, Looney alleges that he was admonished by his supervisor (the Director of Planning and Development for the Town of Marlborough) to "restrict his actions in the office to that of his duties and not to make determinations or engage in discussions of substantive matters outside his job duties concerning other Town agenc[ies] or jurisdiction[s]." Looney also alleges that he was told by that supervisor to stop "voicing his opinion regarding an outside agency enforcing a cease and desist order against Town residents." It could be that a Building Official whose principal responsibilities are the enforcement of the state building code would be involved as part of his job with wood-burning stoves and the potential harms they pose to public health, or – less likely – that his job involved other agencies' cease and desist orders, but such a conclusion is not clear on the basis of the pleadings alone. Indeed, Looney's allegations indicate that, at the very least, the Town's Planning and Development Director believed Looney's comments fell outside his official job duties. In the absence of evidence to the contrary, I do not believe that the defendants are entitled to qualified immunity on Looney's speech claim at this stage.

The defendants could be entitled to qualified immunity by demonstrating that Looney's statements were "likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of [Looney's] expression." *Skehan*, 465 F.3d at 106. For instance, the defendants could demonstrate that Looney's comments were encouraging Marlborough residents not to comply with other local regulations. The defendants could also demonstrate that Looney occupied "an executive or policymaking position" whose "expressive

11

activities . . . will be more disruptive to the operation of the workplace than similar activity by a low level employee." *Faghri v. Univ. of Conn.*, 621 F.3d 92, 98 (2d Cir. 2010) (internal quotation marks omitted). But I do not believe *Fahgri* reaches so far as to inhibit lower-level officials, such as Looney, from being able to publicly challenge Town policies based merely on the allegations presented here. As a result, I conclude that dismissing Looney's First Amendment claim at this stage is premature.

* * *

Looney's complaint contains sufficient allegations to withstand dismissal on the basis of qualified immunity. On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inference in the plaintiff's favor." *McGarry v. Pallito*, 687 F.3d 505, 510 (2d Cir. 2012) (internal quotation marks omitted). Because Looney has sufficiently alleged a constitutionally protected interest in his status as a full-time employee and has adequately alleged that his speech was entitled to First Amendment protections, I conclude that finding the defendants are entitled to qualified immunity would be premature at this time. As a result, I would affirm the district court's decision denying the motion to dismiss and leave the determination of qualified immunity to another day.