**Brian ROSS, Plaintiff,**

v.

**The NEW YORK CITY DEPARTMENT OF EDUCATION, Beth Lubeck–Ceffalia, Stephanie Korotz, and Danielle Santoro, individually and in their official capacities, Defendants.**

No. 10–CV–4937 (NGG)(JO).

United States District Court,
E.D. New York.

March 22, 2013.

Brandon Scott Sipherd, Bryan L. Arbeit, Gregory Nicholas Filosa, Isaac E. Samuels, Jeffrey Kevin Brown, Rick Ostrove, Leeds Brown Law, P.C., Carle Place, NY, for Plaintiff.

Keri Reid McNally, Christopher Aaron Seacord, New York City Law Department, New York, NY, for Defendants.

### MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

Before the court is Defendants' motion for summary judgment arguing that Plaintiff, a public school physical education teacher, is not entitled to First Amendment protection for his speech concerning the condition of a gymnasium. Also before

the court is a portion of Plaintiff's motion to amend his Complaint seeking to add three forms of allegedly protected speech and numerous alleged acts of retaliation. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED and Plaintiff's motion to amend is DENIED.

### I. BACKGROUND

#### A. Factual Background [1]

In September 2005, Plaintiff Brian Ross was hired as an elementary physical education teacher and assigned to New York City Public School 132 ("P.S. 132"), located in the Williamsburg neighborhood of Brooklyn, New York. (Def. 56.1 St. (Dkt. 36) ¶¶ 1–2; Pl. 56.1 St. (Dkt. 39) ¶¶ 1–2.)

P.S. 132 does not have a formal gymnasium. (Def. 56.1 St. ¶ 5; Pl. 56.1 St. ¶ 5.) The school uses a multipurpose room as a gym for physical education classes and as an auditorium. (Def. 56.1 St. ¶ 5; Pl. 56.1 St. ¶ 5.) Physical education classes are also occasionally taught in the school yard and in individual classrooms. (Def. 56.1 St. ¶ 5; Pl. 56.1 St. ¶ 5.)

In April 2010, P.S. 132 Principal Beth Lubeck [2] decided that to make room for mandatory state testing and to accommodate students with special needs, physical education classes had to be taught in a building known as the Settlement House. (Def. 56.1 St. ¶ 23; Pl. 56.1 St. ¶ 23; see Lubeck Dep. (Ex. C to Seacord Decl. (Dkt. 37–3)) at 20:5–21:13.) The Settlement House is a Community Based Organization located approximately two blocks from P.S. 132. (Def. 56.1 St. ¶¶ 24–25; Pl. 56.1 St. ¶¶ 24–25.) It had formerly been the physical education facility for Middle

---

1. Except where otherwise noted, the following facts are undisputed or taken in the light most favorable to Plaintiff.

2. Lubeck no longer uses the surname Lubeck–Ceffalia. (Def. 56.1 St. ¶ 6 n. 1.)

School 577 and had hosted some after-school programs for P.S. 132 students. (Def. 56.1 St. ¶ 26; Pl. 56.1 St. ¶ 26.)

For three days in April and May 2010, Plaintiff taught at the Settlement House for approximately two hours each day. (Def. 56.1 St. ¶ 27; Pl. 56.1 St. ¶ 27.) On the first day, Plaintiff arrived at the Settlement House before his students, walked into the gym, and "was absolutely devastated with what [he] saw." (Ross Dep. (Ex. B to Seacord Decl. (Dkt. 37–2)) at 53:8–17.) The gym was "extremely deteriorated and delipidated. [sic]." (*Id.* at 53:18–55:24.) The bricks and windowsills were covered in "years['] and years['] worth of dust." (*Id.*) Pipes on the ceiling were exposed and leaking. (*Id.*) Walls were covered with what Plaintiff believed to be asbestos. (*Id.*) Lead-based paint was peeling off the walls. (*Id.*) The floor was covered in "some sort of a rubber sub flooring." (*Id.*) Nails and staples were exposed from a stage such that "any student c[ould] brush by and cut themsel[f]." (*Id.*) To get to the only bathroom, "the students had to walk through exposed leaking pipes where there were these massive holes" from which Plaintiff saw a rat emerge. (*Id.*) There was also an unlocked door in the gym that led into an open alleyway in the street such that on his first day, when Plaintiff was teaching either kindergarten or second grade students, "what appeared to be a prostitute came in off the street and asked [him] if [he] could direct her to which room the STD testing [was] in, [at which point Plaintiff] told her she had to leave." [3] (*Id.*) The Settlement House was "a terrible place to be," and "[v]ery unsafe and unhealthy [to anyone,] let alone elementary school students." (*Id.*)

After observing this scene, Plaintiff approached Danielle Santoro, an Assistant Principal at P.S. 132, and informed her of these "serious, serious health and safety issues." [4] (*Id.* at 55:25–56:17; see Def. 56.1 St. ¶ 10; Pl. 56.1 St. ¶ 10.) Santoro told Plaintiff to "keep [his] mouth shut" because the building was to be renovated in the near future. (Ross Dep. at 55:25–56:17.) Plaintiff responded, "[I]f it's a state of the art facility [next year], that's great, but right now you're putting the safety and health of all of these children in danger." (*Id.*) According to Plaintiff, he was worried "for the students currently being taught there" (Pl. 56.1 St. ¶ 29), and raised these issues out of concern for the health and safety of "any students of any age, but certainly elementary [school students]" (Ross Dep. at 63:25–64:3).

Later that day at P.S. 132, Plaintiff told his union chapter leader, Christine Caraballo, about his concerns on his lunch break. (*Id.* at 57:1–21.) Santoro later told Plaintiff to meet with Principal Lubeck first thing the next morning. (Pl. 56.1 St. ¶ 30.) Plaintiff requested that Caraballo be present for this meeting, but before she arrived, Lubeck told Plaintiff that although she had always given him satisfactory evaluations, "none of that [wa]s going to happen[ ] anymore." (*Id.*) Lubeck told Plaintiff that he did not need to teach at P.S. 132 because there were "five people lined up knocking at the door that want[ed] to teach physical education in a mint school like [P.S. 132]." (*Id.*) At the meeting, Plaintiff informed Lubeck of his worries about the Settlement House, including the "lack of an on-site school nurse, first aid kit, fire evacuation plan, or security" out of

---

**3.** This hazard in particular was "extremely important" to Plaintiff. (Ross Dep. at 53:18–55:24.)

**4.** Assistant Principal Stephanie Korotz had also been informed of Plaintiff's concerns. (*See* Def. 56.1 St. ¶ 29; Pl. 56.1 St. ¶ 29.)

"concern[ ] that the safety and health of the students were at risk." (*Id.* ¶ 31.) Lubeck then threatened to fire Plaintiff unless he agreed to continue teaching at the Settlement House. (*See id.* ¶¶ 32–33.) Faced with termination, Plaintiff agreed to continue to teach and stop voicing any concerns to the administration about the condition of the Settlement House. (*See id.* ¶ 36.)

In late April or early May 2010, Plaintiff taught at the Settlement House for a second day. (*See* Def. 56.1 St. ¶ 27; Pl. 56.1 St. ¶ 27.) On that day, Lubeck and Santoro accompanied Plaintiff to the Settlement House, where Plaintiff pointed out each of his safety concerns. (*See* Pl. 56.1 St. ¶ 34.) Lubeck stated that she would instruct the custodial staff to clean the dust, but this never occurred. (*See id.*)

On or about April 27, 2010—either before or after this visit to the Settlement House with Lubeck and Santoro—Plaintiff filed a complaint about the condition of the Settlement House with the Occupational Safety and Health Administration ("OSHA"). (*Id.* ¶ 36; *see* Ross Dep. at 64:4–65:5.) He told the OSHA representative that he was a New York City public school teacher at P.S. 132 who had been directed by his administration to teach in a building not maintained by the Department of Education ("DOE"), and detailed the hazards described above. (Ross Dep. at 66:4–18.) Plaintiff gave OSHA his name, but his complaint was deemed anonymous.[5] (*Id.* at 66:19–22.)

Plaintiff made the OSHA complaint because he "felt there was no other way to protect [his] students." (*Id.* at 65:3–9.) Plaintiff believed that "as an educator, [his] job first and foremost [was] to ensure the health and safety of [his] students." (*Id.* at 65:10–15.) He believed that he could not in good conscience "teach[ ] children in a facility that[ was] going to make them ill or get them injured." (*Id.*)

In response to the complaint, OSHA shut down and inspected the Settlement House, but because the building was undergoing renovations, Plaintiff's complaint—although not declared unfounded—was deemed moot. (Pl. 56.1 St. ¶ 39.)

Plaintiff claims that after this, the P.S. 132 administration retaliated against him for his complaints by issuing meritless disciplinary letters, improperly grading his performance for two school years as "unsatisfactory" (thereby freezing his salary), forcing Plaintiff to proctor exams, and manufacturing parent complaints. (*See id.* ¶¶ 40–121.) Plaintiff claims that prior to his complaints regarding the Settlement House, Lubeck and the rest of the P.S. 132 administration consistently gave him satisfactory reviews. (*See id.* ¶¶ 14–22.)

## B. Procedural History

On October 27, 2010, Plaintiff filed this suit seeking compensatory damages, injunctive relief, and punitive damages against Defendants Principal Beth Lubeck, Assistant Principal Danielle Santoro, and Assistant Principal Stephanie Korotz pursuant to 42 U.S.C. § 1983 for their alleged violations of the First and Fourteenth Amendments.[6] (*See* Compl. (Dkt. 1)

---

**5.** Plaintiff could not recall whether he requested anonymity or if it was OSHA's policy not to disclose claimants' identities. (Ross Dep. at 66:21–25.)

**6.** Plaintiff also seems to allege violations of "related provisions of the New York State Constitution" (Compl. ¶ 86), but the parties

do not address any state law claims in their papers. Because free speech retaliation claims brought by public employees under the First Amendment and the New York State Constitution are subject to the same analysis, *Almontaser v. N.Y. City Dep't of Educ.*, No. 07–CV–10444 (SHS), 2009 WL 2762699, at *2 n. 1 (S.D.N.Y. Sept. 1, 2009); *see Zelnik v.*

¶¶ 87–88.) Plaintiff also asserted a claim against the DOE pursuant to 42 U.S.C. § 1983 and, implicitly, *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). (*See* Compl. ¶ 86.) On March 23, 2011, following an initial conference, Magistrate Judge James Orenstein set a May 20, 2011, deadline for any amendment to the pleadings. (Mar. 23, 2011, Scheduling Order (Dkt. 9).)

On November 10, 2011, after completion of discovery, the court granted Defendants leave to file a motion for summary judgment. (*See* Nov. 10, 2011, Minute Entry.) On March 9, 2012—over sixteen months after filing suit, over nine months after the amendment deadline, and over a month after Defendants served their motion for summary judgment—Plaintiff sought leave to file a motion to amend the Complaint "to add [allegations concerning] the protected activity of speaking to the press and the filing of his lawsuit" and subsequent retaliatory actions. (Mar. 9, 2012, Pl. Ltr. (Dkt. 32) at 1.) On April 2, 2012, Defendants filed the fully bundled motion for summary judgment. (Dkt. 35.) On July 12, 2012, the court granted Plaintiff leave to file his motion to amend, and referred that motion to Judge Orenstein for decision. (July 12, 2012, Order.)

On February 28, 2013, Judge Orenstein granted Plaintiff's motion to amend. (Feb. 28, 2013, Mem. & Order, 2013 WL 762359 (Dkt. 56).) Judge Orenstein held that although Plaintiff's "needless delay [in seeking to amend his Complaint] was inappropriate," Defendants had not demonstrated that amendment would cause any prejudice or undue burden. (*Id.* at 6–7.) In light of the pending motion for summary judgment, however, Judge Orenstein granted Plaintiff's motion "without preju-

dice to the parties' right to seek to supplement their submissions on the pending motion for summary judgment by reference to the arguments concerning futility that they submitted in connection with the ... motion to amend." (*Id.* at 7.) If the court were to deny any portion of Defendants' pending summary judgment motion, Judge Orenstein indicated his willingness to entertain an application to re-open discovery solely for the purpose of "exchanging information in advance of trial (but not as a predicate for any further motion for summary judgment) concerning the newly-alleged acts of retaliation." (*Id.*)

Neither party appealed Judge Orenstein's decision. Plaintiff supplemented his summary judgment briefing "by reference to the arguments concerning futility ... submitted in connection with his motion to amend," but did not seek to submit further evidence. (*See* Mar. 19, 2013, Pl. Ltr. (Dkt. 59).) Defendants requested permission to supplement their summary judgment submissions with an additional 56.1 Statement and memorandum of law. (Mar. 21, 2013, Def. Ltr. (Dkt. 60).)

## II. STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The burden to make this showing rests upon the party moving for summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he court must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods.,*

*Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006), any New York State Constitution

claim is also dismissed.

*Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is created by "specific facts" grounded in testimony or other admissible evidence, not by "mere allegations or denials" of the adverse party's pleadings, *id.*, "by the presentation of assertions that are conclusory," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir.2004), or "by conjecture[ ] or speculation" from the non-movant, *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

## B. Motion to Amend Standard

As relevant here, the court must decide whether Plaintiff's motion to amend his Complaint to include three alleged acts of protected speech and numerous instances of purported retaliation is futile.

Federal Rule of Civil Procedure 15 governs amendment of pleadings. Rule 15(a)(2) provides that unless a party may amend as of right under Rule 15(a)(1), it "may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). "The court should freely give leave when justice requires." *Id.* Similarly, to add a claim concerning a "transaction, occurrence, or event that happened after the date of the pleading to be supplemented," "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading ... even though the original pleading is defective in stating a claim or defense." *Id.* 15(d).

"Leave to amend, though liberally granted, may properly be denied for:

... [']futility of amendment....' " *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir.2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). This standard also applies to motions made under Rule 15(d). *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir.1995) ("Absent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility, [a Rule 15(d) ] motion should be freely granted."). Amendment is futile "when the proposed new pleading fails to state a claim on which relief can be granted.... The adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir.2012). In a procedural context such as this one, however, the typical standard governing the adequacy of a complaint

is different where ... the cross-motion [to amend] is made in response to a [Rule] 56 motion for summary judgment, and the parties have fully briefed the issue [of] whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions. In the latter situation, even if the amended complaint would state a valid claim on its face, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under [Rule] 56(c).

*Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001); *see also Halebian v. Berv*, 869 F.Supp.2d 420, 435 (S.D.N.Y. 2012).

Here, Plaintiff seeks to add three forms of speech that he alleges caused the DOE's retaliation: (1) his speech to co-workers regarding the condition of the Settlement House; (2) the filing of this lawsuit; and (3) his press conference made in connection with this lawsuit.[7] (*See* Pl. Mot. Am. Mem. (Dkt. 52–1) at 2–4; Am. Compl. (Dkt. 57) ¶¶ 84a–d.) After Judge Orenstein partially granted Plaintiff's motion to amend, Plaintiff did not seek to interpose any new arguments or evidence concerning these forms of speech; he only referenced the futility arguments made in connection with the motion to amend.[8] (*See* Mar. 19, 2013, Pl. Ltr.) Defendant opposed Plaintiff's motion to amend on futility grounds, and sought to file supplementary materials concerning Plaintiff's new allegations.[9] (*See* Def. Mot. Am. Opp'n (Dkt. 53) at 3; Mar. 21, 2013, Def. Ltr.)

## III. DISCUSSION

### A. Free Speech Retaliation Claims Alleged in the Complaint [10]

■ " 'To survive a motion for summary judgment on a First Amendment retaliation claim' in the public employment context, 'the plaintiff must present evidence which shows [1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that

there was a causal connection between the protected speech and the adverse employment action.' " *Nagle v. Marron,* 663 F.3d 100, 105 (2d Cir.2011) (citation omitted).

■ Public employees' speech is "protected" "under the First Amendment when they speak as a private 'citizen addressing matters of public concern.' " *Looney v. Black,* 702 F.3d 701, 710 (2d Cir.2012) (quoting *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). "Public employees speaking 'pursuant to their official duties,' however, are not afforded protections under the First Amendment" because they did not make such speech as a private citizen. *Id.* (quoting *Ross v. Breslin,* 693 F.3d 300, 305 (2d Cir.2012)). That is, if the public employee's speech "owes its existence to [her] professional responsibilities," it is not protected by the First Amendment. *Garcetti,* 547 U.S. at 421–22, 126 S.Ct. 1951; *see also Looney,* 702 F.3d at 712 (holding that the plaintiff's speech was unprotected because he alleged that he "spoke on the[ ] issues *because* he was in an official position that required, or at least allowed, him to do so"); *Ross,* 693 F.3d at 308 (holding that speech was not protected because it "owed its existence" to the plaintiff's official duties); *Weintraub v. Bd. of Educ.,* 593 F.3d 196, 203 (2d Cir.2010) (holding that speech was not protected where it was

---

7. Plaintiff also seeks to add numerous allegations of recent retaliation. (*See* Pl. Mot. Am. Mem. (Dkt. 52–1); Am. Compl. (Dkt. 57) ¶¶ 84e–i.) Because the court dismisses all of Plaintiff's originally pled claims and denies leave to amend to add additional forms of speech, it denies the portion of the motion to amend seeking to add numerous instances of alleged retaliation as moot.

8. Also informative is that the only possible additional discovery would concern Plaintiff's new allegations of retaliation, not the new forms of allegedly protected speech. (*See* Feb. 28, 2013, Mem. & Order at 7 ("To the extent that the court denies summary judg-

ment with respect to any claim, I will entertain an application to re-open discovery for the limited purpose of exchanging information in advance of trial (but not as a predicate for any further motion for summary judgment) *concerning the newly-alleged acts of retaliation."* (emphasis added)).)

9. Since the court can decide the issues on the instant record (which Plaintiff did not seek to supplement), Defendants' request is denied as moot.

10. The court addresses the speech raised in Plaintiff's motion to amend *infra* at Part III.B.

"part-and-parcel" of the plaintiff's employment responsibilities). Phrased differently, the "central issue after *Garcetti*" is "the perspective of the speaker—whether the public employee is speaking as a citizen." *Weintraub*, 593 F.3d at 204; *see also id.* (" '[U]nder *Garcetti*, we must shift our focus from the content of the speech to the role the speaker occupied when he said it' to determine whether the speaker was 'acting in her role as 'citizen.' ' " (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir.2007))). This is true even if the subject of the employee's speech is a matter of public concern. *See Ross*, 693 F.3d at 305. Thus, although "the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' " *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951 (quoting *Connick v. Myers*, 461 U.S. 138, 154, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

Determining whether a public employee spoke "pursuant to" her official duties " 'is not susceptible to a bright line rule.' " *Looney*, 702 F.3d at 711 (quoting *Ross*, 693 F.3d at 306). The inquiry, which is "largely a question of law for the court," *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir.2011), is a "practical one," *Garcetti*, 547 U.S. at 424, 126 S.Ct. 1951. The court must examine "the nature of the plaintiff's job responsibilities, the nature of the speech, the relationship between the two[, and o]ther contextual factors, such as whether the complaint was also conveyed to the public." *Ross*, 693 F.3d at 306.

 In expounding upon this admittedly murky area of the law that has no hard and fast rules, the Supreme Court and the Second Circuit have offered a few guideposts. For instance, in examining a plaintiff's job responsibilities, the Supreme Court has reminded us that:

[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424–25, 126 S.Ct. 1951. Also informative is whether the speech at issue has a "civilian analogue"— that is, whether a private citizen could have made the same type of speech. If not, it is more likely to have been made "pursuant to" the public employee's official duties and therefore unprotected by the First Amendment. *See Weintraub*, 593 F.3d at 203–04; *see also Jackler*, 658 F.3d at 241.

Because determinations of whether a public employee spoke pursuant to her official duties can be very fact-specific, a closer examination of cases arising under similar circumstances as the instant case is instructive.

In *Weintraub*, the plaintiff, an elementary school teacher, complained that a supervisor did not properly discipline a student who twice threw books in class. *See* 593 F.3d at 198–99. The plaintiff had testified that the supervisor's failure "put the ... other students at risk." *Id.* at 199. The Second Circuit held that the plaintiff's grievance filed with his union was not protected by the First Amendment because it was " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties,' as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203. This conclusion was "supported by the fact that [the plaintiff's] speech ultimately took the form of an employee

grievance, for which there is no relevant citizen analogue." *Id.*

In *Kelly v. Huntington Union Free School District,* No. 09–CV–2101 (JFB)(ETB), 2012 WL 1077677 (E.D.N.Y. Mar. 30, 2012), a former elementary school teacher had complained to an administrator about, among other things, unsafe boating conditions on a school trip that impeded her ability to teach a particular lesson. *Id.* at *1–2, *12. She argued that this speech was not made "pursuant to" her official duties even though "she believed it was part of her job responsibilities as a teacher to report [these concerns]." *Id.* at *12. The court disagreed and granted summary judgment to the defendants, noting that the plaintiff was concerned for "her students, whose safety she was ultimately responsible," and that "[b]eing able to effectively teach a lesson and ensure student safety are 'indispensable prerequisite[s] to effective teaching and classroom learning.'" *Id.* (quoting *Weintraub,* 593 F.3d at 203) (second alteration in original).

And in *Massaro v. Department of Education of the City of New York,* No. 08–CV–10678 (LTS)(FM), 2011 WL 2207556 (S.D.N.Y. June 3, 2011), the plaintiff, a high school teacher, filed multiple complaints with the Department of Education claiming that mites had infested her classroom. *Id.* at *1. The plaintiff claimed that her complaints led to adverse employment actions. *Id.* at *2. The court granted the defendants' motion for summary judgment, holding that the plaintiff's speech was made "pursuant to" her official duties because "[c]lassroom safety, the practical availability of proper teaching space and

the teacher's ability to perform her duties in the space are, like classroom discipline, 'indispensable prerequisite[s] to effective teaching and classroom learning.'" *Id.* at *4 (quoting *Weintraub,* 593 F.3d at 203) (second alteration in original). It further noted that "[r]egardless of whether Plaintiff was formally tasked with alerting the school to the unsanitary condition in her classroom, ensuring that the room provided a safe learning environment was part of her duties as an educator." *Id.*

With these legal principles in mind, the court examines each form of Plaintiff's speech that allegedly caused adverse employment actions to determine whether it was made "pursuant to" his official duties.[11]

### 1. *Complaints to Administrators*

Plaintiff concedes that his complaints to the school administrators regarding the Settlement House are not protected by the First Amendment. (*See* Pl. Opp'n Mem. at 9.) This portion of Defendants' motion is therefore granted.

### 2. *Complaints to Union Representative*

Plaintiff asserts that his complaints to Caraballo, his union representative, are "likely protected speech" because "there is no evidence he was acting pursuant to an employee grievance process." (*Id.* at 9.) He argues that the Collective Bargaining Agreement ("CBA") between his union and the school district did not permit him to file grievances with the union concerning student safety, implying that the speech was not made pursuant to his official duties. (*See id.* at 10.) Plaintiff also maintains that because he "was engaged in a form of collective action that is available

---

11. Because the court finds that each form of speech alleged in Plaintiff's original Complaint was made pursuant to Plaintiff's official duties, it is unnecessary to examine whether they were also on a matter of public concern,

another requirement for First Amendment protection in this context. This requirement, however, is fatal to some of Plaintiff's newly alleged claims. *(See infra* Part III.B.)

to citizens generally under the National Labor Relations Act[,] there existed a relevant civilian analogue" to his complaints. (*Id.* (citing 29 U.S.C. § 151 *et seq.*).) He adds that he made his complaint during his lunch break, "further indicating that he was acting in the capacity of a citizen and not a public employee." (*Id.* at 10.) He is mistaken.

■ First, Plaintiff is wrong to believe that there is a civilian analogue to his informal complaint to his union representative. The fact that all United States citizens are generally permitted to engage in labor activity does not mean that Plaintiff's complaint to a specific union representative during school hours concerning a particular classroom-related problem has a civilian analogue. Taken to its logical conclusion, Plaintiff's argument would mean that *all* union grievances have a civilian analogue simply because Congress has expressed a general policy in favor of labor activity, a possibility obviously foreclosed by *Weintraub. See* 593 F.3d at 203 ("[The plaintiff's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue.").

■ But more importantly, Plaintiff's arguments ignore the fact that the court's analysis is a "practical" one guided by the totality of the circumstances. *See Garcetti,* 547 U.S. at 424, 126 S.Ct. 1951. Even if Plaintiff could not have filed a grievance with his union, and even if there was a civilian analogue to his complaints to his union representative, these facts are not dispositive. It undisputed that: (1) Plaintiff learned of the unsafe conditions only because he was assigned to teach at the Settlement House (*see generally* Pl. 56.1 St. ¶¶ 23–39); (2) he believed that ensuring the safety of his students was part of his official duties as an educator (*see.* Ross Dep. at 65:3–19, 66:4–18); (3) he reported the unsafe conditions to his union repre-

sentative in order to ensure that safety (*see id.* at 57:1–21); and (4) although he spoke to his union representatives on his lunch break, the conversation was on school property during the school day (*see* Pl. 56.1 St. ¶ 29). As in *Weintraub, Kelly,* and *Massaro,* these undisputed facts, taken together, demonstrate that Plaintiff was acting as an educator, not a private citizen, when he complained to his union representative about the dangers to students caused by the conditions of the classroom in which he was assigned to teach. *See Weintraub,* 593 F.3d at 203; *Kelly,* 2012 WL 1077677, at *12; *Massaro,* 2011 WL 2207556, at *4. This speech is therefore not protected by the First Amendment, and this portion of Defendants' motion is granted.

### 3. *OSHA Complaint*

■ Defendants argue that Plaintiff's anonymous OSHA complaint was also made as a public employee and therefore is not entitled to First Amendment protection for three reasons: (1) Plaintiff informed OSHA of the same concerns he raised to the administrators and his union representative because he believed that he had a duty to ensure the health and safety of his students; (2) complaints to outside agencies are not automatically protected by the First Amendment; and (3) Plaintiff's OSHA complaint had no civilian analogue. (*See* Def. Mem. at 12–17.) Plaintiff maintains that where speech made to an external agency has been held unprotected by the First Amendment, "it was because part of that employee's official duties was to interact with or report to that agency." (Pl. Opp'n Mem. at 12.) He also disputes Defendants' claim that there was no civilian analogue to the OSHA complaint. (*Id.* at 12–13.) Because "complaining to any external agency about unsafe conditions" at the school was not part of Plaintiff's

official duties, he contends, his OSHA complaint was made as a citizen and deserving of First Amendment protection. (*See id.*) He is again mistaken.

As mentioned above, Plaintiff unquestionably learned about the Settlement House's condition solely because of his public employment. (*See generally* Pl. 56.1 St. ¶¶ 23–39.) But more importantly, Plaintiff himself testified repeatedly that he filed the OSHA complaint *because of* his duties as an educator. Specifically, Plaintiff stated that "as an educator, [his] job first and foremost [was] to ensure the health and safety of [his] students." (Ross Dep. at 65:10–15.) He could not in good conscience "teach[ ] children in a facility that[ was] going to make them ill or get them injured" and filed the complaint because he "felt there was no other way to protect [his] students." (*Id.* at 65:6–15; *see also* Am. Compl. ¶ 25 (On April 27, 2010[,] fearing for the health and safety of his students, [Plaintiff] filed an anonymous complaint with [OSHA]."); Pl. 56.1 St. ¶ 36 ("Plaintiff felt [that filing the OSHA complaint] was the only way to protect the students at P.S. 132.").) These admissions weigh strongly in favor of non-protection. *See Weintraub,* 593 F.3d at 199 (holding that a teacher's speech claiming that a supervisor's action "put ... students at risk" was unprotected by the First Amendment); *Kelly,* 2012 WL 1077677 at *12 (finding a teacher's complaints motivated by her concern for "the safety of her students, whose safety she was ultimately responsible" for was unprotected because "[b]eing able to effectively teach a lesson and ensure student safety are 'indispensable prerequisite[s] to effective teaching and classroom learning'" (quoting *Weintraub,* 593 F.3d at 203) (second alteration in original)); *Massaro,* 2011 WL 2207556, at *4 ("Classroom safety, the practical availability of proper teaching space and the teacher's ability to perform her duties

in the space are, like classroom discipline, 'indispensable prerequisite[s] to effective teaching and classroom learning.'" (quoting *Weintraub,* 593 F.3d at 203) (alteration in original)); *Felton v. Katonah Lewisboro Sch. Dist.,* No. 08–CV–9340 (SCR), 2009 WL 2223853, at *5 (S.D.N.Y. July 27, 2009) ("The case law and the Amended Complaint itself recognize that these responsibilities—ensuring that a classroom is well supplied, safe, and conducive to learning and that the curriculum is substantively appropriate—are quintessentially those of a teacher and a teacher's aide."); *cf. Woodlock v. Orange Ulster B.O.C.E.S.,* 281 Fed. Appx. 66, 67–68 (2d Cir.2008) ("Woodlock's communications regarding [a student] and the lack of physical education and art classes at the Cornwall satellite were made pursuant to her 'official duties' as a special education counselor, in which capacity she was responsible for monitoring her students' behavior, needs, and progress.").

Plaintiff's testimony regarding the *content* of his OSHA complaint is also telling. When asked about his conversation with the OSHA representative, Plaintiff testified:

I explained the situation that I—I'm a New York City school teacher, I teach physical education in P.S. 132 in Williamsburg. I recently had been directed by my administration to teach in a non Department of Education building called the settlement house and I described what I saw, which was what I described to you earlier, the peeling of lead paint, the leaking pipes, et cetera.

(Ross Dep. at 66:8–18.) If Plaintiff were speaking as a private citizen, one would imagine that he would not have stressed to OSHA his status as a teacher assigned to the Settlement House. *Cf. Anemone v. Metro. Transp. Auth.,* 629 F.3d 97, 116 (2d Cir.2011) (holding the plaintiff's speech unprotected, in part, because he never told

the outside agencies "that he was acting solely as a private person"). This further supports the conclusion that Plaintiff made his OSHA complaint "pursuant to" his official duties.

Moreover, even if there is a civilian analogue to Plaintiff's OSHA complaint, it is clear that he did not make the complaint *as a* citizen.[12] Plaintiff points to a portion of OSHA's website that states: "In addition [to employees or their representatives], anyone who knows about a workplace safety or health hazard may report unsafe conditions to OSHA, and OSHA will investigate the concerns reported." (Ex. 3 to Ostrove Decl. (Dkt. 42–1) at 1–2.) OSHA's correspondence, however, indicates that Plaintiff made his complaint *as an employee.* (*See* Apr. 28, 2010, Dep't of Labor Ltr. (Ex. N to Seacord Decl. (Dkt. 37–9)) (informing the Settlement House that the Department of Labor had received notice that "[e]mployees working in the gymnasium [we]re exposed to asbestos ... [and e]mployees working in the gymnasium [we]re exposed to possible lead exposure"); July 21, 2010, Dep't of Labor Ltr. (Ex. X to Seacord Decl. (Dkt. 37–9)) (informing Plaintiff that OSHA closed the case and appreciating Plaintiff's "action on behalf of safety and health *in the workplace* (emphasis added)).)

Plaintiff's insistence that he was not specifically tasked with alerting an outside agency about his classroom's safety is a red herring. As mentioned above, formal job descriptions do not control the court's inquiry. *See Garcetti,* 547 U.S. at 424–25, 126 S.Ct. 1951; *see also Massaro,* 2011 WL 2207556, at *4 ("Regardless of whether Plaintiff was formally tasked with alerting the school to the unsanitary condition in her classroom, ensuring that the room provided a safe learning environment was part of her duties as an educator."). And although in many cases where the plaintiff's speech made outside the organization was ruled unprotected, the plaintiff had often corresponded with that agency in the past, *see, e.g., Anemone,* 629 F.3d at 116 (relying on, among other things, the fact that the plaintiff "regularly interacted"

---

12. The court is not convinced that there is a civilian analogue to an OSHA complaint. Plaintiff identified himself as a teacher at P.S. 132 to the OSHA representative, but that his name was not to be disclosed. (*See* Ross Dep. at 66:8–25.) This type of complaint—one in which the caller's name is disclosed to OSHA, but not outside the agency—appears to be only available to employees, not citizens generally. *Cf.* 29 U.S.C. § 657(f)(1) (authorizing "[a]ny employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, [to] request an inspection by giving notice ... [but] upon the request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear [in any public publications]"); Complaint Form, OSHA, available at http://www.osha.gov/pls/osha7/eComplaintForm.html (listing "Complainant Name" as a required field, but allowing the complainant to request that her name not be revealed to her *employer*). This suggests that a civilian analogue to Plaintiff's OSHA complaint does not exist. *Cf. Jackler,* 658 F.3d at 241 ("[A]n indicium that speech by a public employee has a civilian analogue is that the employee's speech was to 'an independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society *regardless of his status as a public employee.*' " (emphasis added) (quoting *Weintraub,* 593 F.3d at 204)). In any event, Plaintiff's OSHA complaint is certainly not akin to the two types of citizen analogues recognized in *Garcetti:* (1) a "letter to a local newspaper"; and (2) "discussi[ons of] politics with a co-worker." 547 U.S. at 422–23, 126 S.Ct. 1951. Regardless, the existence of a civilian analogue is not dispositive. *See Weintraub,* 593 F.3d at 203–04 ("Although the lack of a citizen analogue is 'not dispositive' in this case, it does bear on the perspective of the speaker—whether the public employee is speaking as a citizen ...." (quoting *Garcetti,* 547 U.S. at 420, 126 S.Ct. 1951)).

with outside agencies), no court has ever found this fact to be dispositive.

In the end, Plaintiff's own admissions give the court the clearest picture as to whether he was speaking "pursuant to" his official duties as a physical education teacher. His repeated statements regarding *why* he contacted OSHA and the *content* of his complaint shed the most light on the "central issue" in this case: the "perspective of the speaker." [13] *Weintraub*, 593 F.3d at 204; *see also Anemone*, 629 F.3d at 116 (relying, in part, on the plaintiff's testimony that he "viewed cooperating with these offices as among his duties"); *Frisenda v. Inc. Vill. of Malverne*, 775 F.Supp.2d 486, 507 (E.D.N.Y. 2011) ("[T]aken together, all of these undisputed facts paint a clear picture of an employee speaking out about his views regarding how best to perform his job duties, rather than of someone attempting to make a 'contribution to the civic discourse.'" (quoting *Garcetti*, 547 U.S. at 422, 126 S.Ct. 1951)). For these reasons, Plaintiff's OSHA complaint was made pursuant to his official duties and is not eligible for First Amendment protection, and this portion of Defendants' motion for summary judgment is therefore granted.[14]

* * *

All Free Speech retaliation claims alleged in Plaintiff's original Complaint are therefore dismissed. The court now turns to Plaintiff's motion to amend seeking to add three additional forms of speech.

**B. Motion to Amend**

The only issue before the court relating to Plaintiff's motion to amend is whether such amendment would be futile. For the following reasons, the court holds that amending the Complaint to include three forms of allegedly protected speech—Plaintiff's speech with co-workers; the filing of this lawsuit; and his speech to the press—would be futile. The motion to amend is therefore denied.

*1. Speech With Co-Workers*

■ Plaintiff's attempt to include his speech with co-workers would be futile. As with Plaintiff's complaint to his union representative, it is clear that his discussions with his co-workers were made "pursuant to" his official duties and are therefore are unprotected by the First Amendment. (*See supra* Part III.A.2.) As detailed above, it is undisputed that Plaintiff: (1) learned of the relevant information solely because of his job as a physical education teacher assigned to the Settlement House; (2) made this speech on school grounds during the school day; and (3) believed that ensuring the safety of his students was part of his duties as an educator. (*See id.*) Although a conversation with co-workers does not lack a civilian analogue, which admittedly weighs in favor of First Amendment protection, this fact is not dispositive and, in the court's view, not sufficient to overcome its firm impression that Plaintiff's speech was made "pursuant to" his official duties.

13. Perhaps most indicative of Plaintiff's perspective is the fact that he directed his complaint to OSHA, an organization that Congress created principally to ensure *worker* safety. *See* OSH Act of 1970, Pub. L. No. 91–596, 84 Stat. 1590, § 2(b) ("The Congress declares it to be its purpose and policy ... to assure so far as possible every working man and woman in the Nation safe and healthful working conditions....").

14. Plaintiff asks the court to strike Defendants'. citation to *Manemeit v. Town of Branford*, No. 04–CV–1353 (CFD), 2009 WL 1743749 (D.Conn. June 18, 2009). (*See* Apr. 24, 2012, Pl. Ltr. (Dkt. 45).) This motion is denied because the court has read the decision—which is admittedly ambiguous as to whether a plaintiff's OSHA complaint is protected by the First Amendment—and has given the case the appropriate weight.

Amending the Complaint to include this claim would therefore be futile, and this portion of Plaintiff's motion to amend is denied.

### 2. *Filing of This Lawsuit*

■ Plaintiff's claim that Defendants retaliated against him for filing this lawsuit also fails on the merits, making amendment futile. Even assuming that Plaintiff did not make this speech "pursuant to" his official duties (but spoke as a private citizen), it is clear that the lawsuit does not relate to a matter of "public concern." [15] *See Ruotolo,* 514 F.3d at 188.

■ A plaintiff asserting a First Amendment retaliation claim must prove not only that her speech was made as a private citizen and not as a public employee, but must also establish that the speech addressed a matter of "public concern." *See id.* " 'Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.' " *Id.* at 189 (citation omitted). "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.' " *Id.* (citation omitted).

In *Ruotolo,* the Second Circuit squarely held that a public employee's private lawsuit that "concern[ed] essentially personal grievances and [sought] relief ... for himself alone ... is not speech on a matter of public concern and cannot sustain a First Amendment retaliation claim." *Id.* at 190; *see also Storman v. Klein,* 395 Fed.Appx. 790, 793–94 (2d Cir.2010) ("An employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking upon matters only of personal interest.' " (quoting *Sousa v. Roque,* 578 F.3d 164, 174 (2d Cir.2009))). There, the plaintiff's complaint alleged that his protected speech "led to retaliatory acts affecting [him] alone." *Ruotolo,* 514 F.3d at 189. The "acts of alleged retaliation against [the plaintiff bore] upon the circumstances and perquisites of his employment, such as reassignment, transfer, time off, and discipline." *Id.* at 190. The relief sought was "almost entirely personal to [the plaintiff], including compensatory damages and an injunction relating to [his] employment records." Thus, the court concluded, the lawsuit did not address a matter of public concern and was not protected by the First Amendment.

Here, Plaintiff's Complaint is unquestionably not a matter of public concern. Nearly all of Plaintiff's factual allegations concern only *his* complaints regarding the Settlement House and retaliatory acts that affected only *his* employment. (*See generally* Compl. ¶¶ 12–25.) As in *Ruotolo,* the only relief Plaintiff seeks is relevant to him: $15,000,000 in "compensatory, emotional and physical damages, lost compensation, front pay, injunctive relief, punitive [damages] and any other damages permitted by law." (*Id.* at 16; *see also id.* ¶¶ 85, 88 (alleging that "[a]s a direct and proximate result of the aforementioned retaliation," Defendants caused Plaintiff "to suffer loss of earnings, accrued benefits, in addition to suffering great pain, humiliation, as well as physical and emotional damages").) All told, under *Ruotolo* it is clear that Plaintiff's lawsuit does not ad-

---

**15.** Plaintiff claims that Defendants waived any right to contest whether Plaintiff's speech was on a matter of public concern. (Pl. Opp'n at 13 n. 8.) Defendants, however, only conceded that they "must accept the veracity of plaintiff's allegations concerning the purely altruistic motive" for his complaints to administrators. (Def. Mem. at 9 n. 1.) They did not so concede as to the filing of Plaintiff's lawsuit or his press conference.

dress a matter of public concern and is not eligible for First Amendment protection; allowing amendment to include this claim would be futile. This portion of Plaintiff's motion is therefore denied.

### 3. *Speech to the Press*

 Finally, Plaintiff is also denied leave to add his proposed First Amendment retaliation claim regarding his press conference. As with the filing of Plaintiff's lawsuit, it is clear that even assuming Plaintiff spoke as a public citizen, his speech was not on a matter of public concern.

 "Speech that, although touching on a topic of general importance, primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation,' such as his or her assignments, promotion, or salary, does not address matters of public concern." *Jackler*, 658 F.3d at 236 (quoting *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir.1991) (alteration in original)). "[W]hile motive surely may be one factor in [determining whether speech is on a matter of public concern], it is not, standing alone, dispositive or conclusive." *Sousa*, 578 F.3d at 175. "Nor does the fact that expressive conduct is public mean that its subject is a matter of public concern." *Jackler*, 658 F.3d at 236. Rather, the court must examine "the content, form, and context of a given statement, as revealed by the whole record." *Sousa*, 578 F.3d at 175.

Here, amendment to include Plaintiff's press conference would be futile because his speech cannot be said to have been on a matter of public concern. Rather, his speech was entirely focused on the unlawful retaliation that he received, and the filing of his recent lawsuit seeking personal redress. For one thing, Plaintiff was motivated not by a desire to inform the public, but to further his recently filed

lawsuit. When asked why he conducted the press conference, Plaintiff testified that he did so "upon the advice of [his] attorneys," who had just filed this federal lawsuit. (*Id.* at 149:6–7.) Plaintiff chose to conduct the conference on the steps of the DOE also "[u]pon the advice of [his] attorneys." (*Id.* at 150:16–20.)

Moreover, the overall context of Plaintiff's speech indicates that he was speaking about his personal dissatisfaction with the DOE, not for any overall concern for the health of New York City school children. Plaintiff testified that at the press conference he "explained the story that [he told Defendants' counsel, and] the horrible circumstances that [he] ha[d] been undergoing in retaliation at [his] school based on trying to protect the health and safety of [his] children." (*Id.* at 150:7–12.) And each of the news articles that Plaintiff identifies in his Amended Complaint (*see* Am. Compl. ¶ 84d) focuses on Plaintiff's concern with the alleged retaliation. (*See* Oct. 27, 2013, News 12 art. (Ex. 2 to Pl. Mot. Am. Reply (Dkt. 54–3)) ("Brian Ross says he is suing the school's administrators after the principal of the school threatened his job if he didn't keep quiet about the conditions of [the Settlement House]."); Oct. 27, 2013, N.Y. 1 art. (Ex. 2 to Pl. Mot. Am. Reply (Dkt. 54–3)) (" 'Just a terrible circumstance. When I expressed [my concerns over the Settlement House] to my principal, she threatened my job. She explained to me that there's a line of people knocking at her door hoping they could have her job at the school,' Ross said. . . . The lawsuit seeks to clear Ross' record of any disciplinary violations, along with $15 million in damages. . . . Ross says he has received an unsatisfactory review from his superiors; which the teacher's union is helping to appeal."); Oct. 27, 2013, N.Y. Post art. (Ex. 2 to Pl. Mot. Am. Reply (Dkt. 54–3)) ("Brooklyn teacher Brian

Ross says administrators have retaliated against him ever since he complained in April that the school's temporary gym was rife with mold, peeling lead paint and rodents." ... Ross yesterday filed a $15 million lawsuit against the city Department of Education, claiming that PS 132 Principal Beth Lubeck–Ceffalia gave him menial assignments and a poor rating for complaining to federal safety inspectors about conditions in the off-site gym.... Ross said he was replaced with a substitute almost immediately after complaining.").)

Plaintiff's attempts to characterize his speech to the press as one on a matter of public concern are unavailing. He claims that his

> lawsuit and speech to the press both relate to matters of public concern because it [sic] exposed to the community the improper use of the Settlement House and the Individual Defendants' retaliatory actions against Plaintiff for trying to stop its use. Exposure of wrongdoing and improper conduct by public officials constitutes a matter of public concern.

(Pl. Mot. Am. Reply at 9.) Although Plaintiff's press conference may have "exposed" allegedly improper conduct, this form of speech was primarily concerned with his *personal* dissatisfaction with adverse employment decisions and his *personal* lawsuit that sought to only redress *personal* injuries. *See Jackler,* 658 F.3d at 236 ("Speech that, although touching on a topic of general importance, primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation,' such as his or her assignments, promotion, or salary, does not address matters of public concern." (alteration in original) (citation omitted)). Accordingly, given Plaintiff's own testimony, and the circumstances surrounding the press conference, such speech was not on a matter of public concern and is not protected by the First Amendment. The motion to amend is therefore denied as futile.

## C. Petition Clause Retaliation Claims

■ In addition to his Free Speech Clause retaliation claims, Plaintiff purports to bring claims under the Petition Clause of the First Amendment.[16] (*See* Pl. Opp'n Mem. at 14–15.) These claims must also be dismissed for two reasons.

First, it appears that Plaintiff has not properly pled a Petition Clause claim. The Complaint alleges only generally that "Defendants' [sic] have, while acting under color of state law, deprived plaintiff of his constitutional rights, as secured by the First and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983, and all related provisions of the New York State Constitution." (Compl. ¶ 86; *see id.* ¶ 87 ("The individual defendants unlawfully participated in and/or permitted the aforementioned harassment and/or retaliation to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.").) Plaintiff's specific factual allegations imply only claims under the Free Speech Clause. (*See id.* ¶ 27 ("Since [he filed the OSHA Complaint, Plaintiff] has been subjected to a pervasive pattern of adverse employment actions in retaliation for speaking out regarding a matter of public concern." (emphasis added)).) And Plaintiff's Amended Complaint—submitted after his opposition to Defendants' motion for summary judg-

---

**16.** The Petition Clause guarantees that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." U.S. Const. amend. I.

ment, which for the first time identifies a Petition Clause claim—also does not mention the Petition Clause. (*See* Am. Compl.)

Even if Plaintiff has properly pled a Petition Clause claim, however, it fails on the merits. The Second Circuit has not specified what standard applies to public employees' claims alleging retaliation for their activity under the Petition Clause of the First Amendment. The Supreme Court did recently address the Petition Clause in *Borough of Duryea v. Guarnieri*, —— U.S. ——, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011), but did not set out a definitive test governing the circumstances present here. In *Guarnieri*, the Third Circuit had affirmed a successful claim brought by a police chief under the Petition Clause relating to his grievances and lawsuit, rejecting the defendants' argument that a Petition Clause claimant must demonstrate that his petitioning activity touched a matter of public concern. *See id.* at 2492–93. The Supreme Court reversed, narrowly holding that the "public concern test" developed under the Free Speech Clause—which the Third Circuit refused to apply—also governs public employees' Petition Clause claims. *See id.* at 2500–01. The Supreme Court did not explicitly address whether the "official duties" test under the Free Speech Clause—which, as detailed above, requires a public employee to show that his speech was made as a citizen, and not "pursuant to" his official duties—also applies to Petition Clause claims.

██ Despite this slight ambiguity, the court now concludes that a public employee asserting a claim under the Petition Clause must prove that his petitioning activity was made as a citizen and not pursuant to his official duties. For one thing, *Guarnieri* strongly implied this to be the case. *See id.* at 2495 ("[C]onsiderations that shape the application of the Speech Clause to public employees apply with equal force to claims by those employees under the Petition Clause."); *id.* at 2500 ("When a public employee seeks to participate, *as a citizen*, in the process of deliberative democracy, either through speech or petition, 'it is necessary to regard the [employee] as the member of the general public he seeks to be.'" (emphasis added) (citation omitted) (alteration in original)); *id.* ("When a public employee petitions *as a citizen* on a matter of public concern, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs." (emphasis added)); *id.* at 2501 ("The right of a public employee under the Petition Clause is a right to participate *as a citizen*, through petitioning activity, in the democratic process. It is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." (emphasis added)); *cf. id.* at 2500 ("The framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right."). Moreover, *Guarnieri* cited *White Plains Towing Corporation v. Patterson*, 991 F.2d 1049 (2d Cir.1993)—which stated that "[t]he First Amendment right to petition the government for a redress of grievances ... is 'generally subject to the same constitutional analysis' as the right to free speech," *id.* at 1059 (citation omitted)—in noting the "substantial overlap between the rights of speech and petition [that] justify the application of Speech Clause precedents to Petition Clause claims," 131 S.Ct. at 2493. And finally, district courts in the Second Circuit have recently applied the "official duties" test to claims brought by public employees under the Petition Clause. *See, e.g., Lenox v. Town of N. Branford*, No. 08–CV–1488 (DJS), 2012

WL 6102470, at *10 (D.Conn. Dec. 7, 2012) ("This Court will analyze the Plaintiff's allegedly protected petition under the same test it would use to analyze allegedly protected speech."); *Fahs Constr. Grp., Inc. v. Gray*, No. 10–CV–0129 (GTS)(DEP), 2012 WL 6097293, at *5 n. 2 (N.D.N.Y. Dec. 7, 2012) ("The Supreme Court recently held that the framework used to govern Speech Clause claims by public employees will also apply to claims under the Petition Clause."). Accordingly, the court's analysis regarding Plaintiff's Free Speech claims applies equally to his Petition Clause claims.

Plaintiff argues that *Guarnieri* "did not apply *Garcetti's* 'official duties' test to the Petition Clause [because] it told courts to 'not presume there is always an essential equivalence in the two Clauses or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims.' " (Pl. Opp'n Mem. at 14 n. 9 (quoting *Guarnieri*, 131 S.Ct. at 2495).) The Supreme Court did caution against adopting Free Speech jurisprudence to claims brought under the Petition Clause wholesale because "[t]here may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis; and if that is so, the rules and principles that define the two rights might differ in emphasis and formulation." *Guarnieri*, 131 S.Ct. at 2495. But Plaintiff ignores the fact that the Supreme Court went on to explicitly state that "claims of retaliation by public employees do not call for this divergence." *Id.* It did not refuse to apply *Garcetti's* "official duties" test, but implied just the opposite. For the reasons set forth above in Parts III.A and III.B, therefore, Plain-

tiff's Petition Clause claims are dismissed.[17]

## IV. CONCLUSION

Defendants' motion for summary judgment is GRANTED. Plaintiff's motion to amend is DENIED. The Clerk of Court is respectfully directed to enter judgment and close the case.

---

**17.** Because all of Plaintiff's underlying claims fail, so does his claim against the DOE under *Monell*. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").